UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

ALI NASER MUAALLA AND
SENA ALI MUAALLA,

    Defendants.
_____/

Case No. 17-cr-20434

UNITED STATES DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

UNITED STATES MAGISTRATE JUDGE
ELIZABETH A. STAFFORD

### OPINION AND ORDER ACCEPTING IN PART AND REJECTING IN PART GOVERNMENT'S CALCULATION OF ECONOMIC LOSS

**I.    Introduction**

Defendants Ali Naser Muaalla and Sena Ali Muaalla were indicted on June 27, 2017.[1] *See* Dkt. No. 1. Then, on January 16, 2018, both Defendants pleaded guilty to certain charges. *See* Dkt. Nos. 28, 31. Ali pleaded guilty to Count I of the Indictment, which charged him with conspiring to defraud the United States, 18 U.S.C. § 371. *See* Dkt. No. 28. Sena, on the other hand, pleaded guilty to Count I of a First Superseding Information, which charged her with food stamp fraud of less than $100, 7 U.S.C. § 2024(b). *See* Dkt. No. 27, p. 1 (Pg. ID 89); *see also* Dkt. No. 31, pp. 1–2 (Pg. ID 101–02).

---

[1] Because the Defendants have the same last name, for ease of reference, the Court will refer to the Defendants by their first names.

The parties dispute only the amount of economic loss for incorporation into the Defendants' sentencing guidelines calculation. *See* U.S.S.G. § 2B1.1(b)(1). And even there, the Defendants generally acknowledge the Government's proposed methodologies, which are the "comparative store method" and "post-search warrant" method. According to the Government, Ali's economic loss is between $1,595,000 (post-search warrant method) and $2,138,000 (comparative store method). Dkt. No. 35, pp. 13, 17 (Pg. ID 147, 151). Sena's economic loss, the Government contends, is between $1,526,000 (post-search warrant method) and $1,936,000 (comparative store method). *Id.* at pp. 13–14, 17–18 (Pg. ID 147–48, 151–52). These totals combine both Defendants' supposed economic loss for the Supplemental Nutrition Assistance Program ("SNAP") and the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC").

The Government, on March 23, 2018, submitted a sentencing memo outlining its economic loss analysis. *See id.* The Defendants did not file sentencing memoranda, but presented their positions at an evidentiary hearing, which the Court held over three days, starting on May 30, 2018. *See* Dkt. No. 36. For the following reasons, the Court will ACCEPT IN PART and REJECT IN PART the Government's calculation of loss. The Court will find that the Government has demonstrated by a preponderance of evidence that the Defendants' loss amount is

greater than $550,000, but no more than $1,500,000. Therefore, Ali and Sena's specific offense characteristics yield a score of fourteen points.

## II. Background

Ali owned and operated a convenience store called Modern Save A Lot, which was located in Dearborn, Michigan. Dkt. No. 28, p. 2 (Pg. ID 93). Sena, Ali's daughter, helped manage the store. Dkt. No. 31, p. 2 (Pg. ID 102). Modern Save A Lot accepted SNAP and WIC benefits from its customers, utilizing authorization from the United States Department of Agriculture ("USDA"). Dkt. No. 28, p. 2 (Pg. ID 93). Both Defendants pleaded guilty to accepting SNAP and WIC benefits in exchange for a discounted amount of cash, ineligible items (e.g. tobacco, hookah pipes), or both. *Id.*; *see also* Dkt. No. 31, p. 2 (Pg. ID 102). Additionally, Ali acknowledges purchasing SNAP and WIC benefits in exchange for cash and using the benefits at other stores to obtain merchandise for Modern Save A Lot. Dkt. No. 28, p. 2 (Pg. ID 3). The economic loss attributable to Ali spans from December 2006 through November 2013, and that for Sena stretches from January 2010 to November 2013. *See, e.g.*, Dkt. Nos. 35-12, 35-14.

During the evidentiary hearing, the Court heard testimony from Travis Deters, a Special Agent of the USDA, Office of the Inspector General. He calculated the Government's estimation of the Defendants' economic loss, and explained his methods. First, for the comparative stores method, he said that he used USDA Food

3

and Nutrition Service categorizations to identify comparable stores. Next, he identified five other convenience stores within three miles of Modern Save A Lot that had also redeemed SNAP and WIC benefits during the relevant period. On the assumption that these stores had only legal sales, Deters averaged these stores' SNAP and WIC redemptions for each month during the relevant period. Third, he subtracted the comparable stores' average each month during the relevant period from Modern Save A Lot's SNAP and WIC redemptions for each corresponding month. By totaling the difference for each relevant month, Deters arrived at the amount of economic loss attributable to each Defendant.

The post-search warrant method is relatively simple. It assumes that Modern Save A Lot stopped making fraudulent sales after the execution of the search warrant in November 2013. The method compares (1) the average of the SNAP and WIC redemptions in each post-search warrant month with (2) the SNAP and WIC redemptions for each pre-search warrant month. Deters stated that, after adding the difference between these two figures for the relevant time periods, he arrived at the total economic loss based on the post-search warrant method.

## III. Discussion

The Court concludes that the Defendants' proposal of economic loss of $64,321.81 is unsupported by the evidence. The Government has also not demonstrated by a preponderance of the evidence that the Defendants' economic loss is greater

than $1,500,000. Yet the Government has presented sufficient evidence for the Court to find that the Defendants' loss amount is greater than $550,000, but less than $1,500,000.

### A. Defendants' Economic Loss

The Government must prove—by a preponderance of the evidence—the amount of economic loss. *See United States v. White*, 846 F.3d 170, 179 (6th Cir. 2017) (citing *United States v. Healy*, 553 F. App'x 560, 564 (6th Cir. 2014)). "When determining the amount of loss for sentencing purposes," the Sixth Circuit has instructed district courts to estimate economic loss as "the actual or intended loss to a victim, whichever is greater, or a combination thereof." *United States v. Mahbub*, 818 F.3d 213, 231 (6th Cir. 2016) (internal quotation marks and citations omitted). Courts do not have to be precise. *See United States v. Sayed*, No. 13-CR-20496, 2014 WL 7157104, at *1 (E.D. Mich. Dec. 14, 2014) (citing *United States v. Triana*, 468 F.3d 308, 320 (6th Cir. 2010)). Instead, only reasonableness is necessary. U.S.S.G. § 2B1.1, cmt. app. note 3(C); *see also United States v. Wendlandt*, 714 F.3d 388, 393 (6th Cir. 2013) (concluding that "[b]ecause of the difficulties often associated with attempting to calculate loss in a fraud case, the district court 'need only make a reasonable estimate' of the loss using a preponderance of the evidence standard." (quoting *United States v. Jones*, 641 F.3d 706, 712 (6th Cir. 2011) (citing *United States v. Howley*, 707 F.3d 575, 583 (6th Cir. 2013)))).

5

1. The Defendants' Estimate of Their Economic Loss

The Defendants contend that their economic loss is $64,321.81. This estimate is not reasonable. To develop this calculation, the Defendants relied on Karl F. Haiser, Jr., a certified public accountant. Haiser testified at the evidentiary hearing and, upon cross-examination by the Government, the Defendants' position was quickly unraveled.

Haiser testified that this estimate is based on the twelve undercover operations which federal agents conducted at the store. Specifically, his method assumes that these operations are a representative sample of the number of fraudulent transactions that occurred at Modern Save A Lot during the relevant period. Therefore, according to Haiser, an extrapolation of these operations establishes the total amount of economic loss in this case.

Haiser's calculation is first undone by Agent Deters's testimony that agents conducted the undercover operations at random and did not intend for the operations to represent the total amount of fraud taking place at Modern Save A Lot. Instead, the agents were just trying to uncover fraud. The record supports Agent Deters's contention. For example, both Defendants have admitted to engaging in fraud in 2012, and in that year, the Government did not conduct any undercover operations at Modern Save A Lot.

Second, Haiser insinuated that his methods in this case had been accepted by another court in this district. *See United States v. Mukul*, 15-cr-20132 (E.D. Mich. Dec. 15, 2015), ECF No. 38. The Government, however, established that his methods were not approved by the *Mukul* court. Indeed, Judge Avery Cohn rejected Haiser's testimony, finding that he had wrongly assumed that undercover transactions reflected the entire amount of the defendant's fraud. *Id.* at pp. 42–43, 57–59 (Pg. ID 233–34, 248–50).

Additionally, in this case, Haiser testified that the Government should discount the amount of economic loss attributable to Sena, as compared to Ali, because Sena was just a store employee, not a manager or an owner. This contention was unsupported, and even contradicted, by the evidence. Haiser based his definition of ownership or management on Internal Revenue Service standards, which of course do not apply here. What is more, a 2008 letter that Sena sent to the WIC program undermines Haiser's statement. In that letter, Sena wrote that she was an owner or manager of Modern Save A Lot, had power of attorney at the store, and would answer any questions that the WIC program might pose to the store.[2]

In sum, the Court finds that Haiser was neither a reliable nor credible witness, at least as to his analysis of the Defendants' theory of economic loss. Haiser's

---

[2] Although this letter is dated before the period covered in Sena's plea agreement, the record is consistent with respect to Sena's role at the store.

opinions generally lacked adequate foundation and, on occasion, involved pure speculation. Given his testimony, the Court is unconvinced that Haiser understands the nature of the conspiracy in this case, and in particular, the role that the undercover agents' overt acts played in uncovering the Defendants' scheme. And despite this lack of understanding, Haiser still grounded his analysis in the overt acts alleged.

2. The Government's Estimate of Defendants' Economic Loss

The Government argues, and the Court agrees, that the economic loss here is the total value of the SNAP and WIC benefits involved. *See United States v. Arnous*, 122 F.3d 321, 323 (6th Cir. 1997) (observing that "[w]hen food stamp coupons are exchanged for cash or unauthorized products, the coupons are diverted from their intended use—the purchase of specified food products. The loss caused by the defendant's conduct under such circumstances is the face value of the coupons exchanged." (citing *United States v. Barnes* 117 F.3d 328, 334–35 (7th Cir. 1997))).

Likewise, the Sixth Circuit has sanctioned the Government's proposed methodologies. For example, in *United States v. Sufi*, 456 F. App'x 524, 528 (6th Cir. 2012), the Sixth Circuit affirmed the district court's finding that Agent Deters had arrived at a reasonable estimate of economic loss when he applied—as he did here—the comparative stores method. *See also United States v. Sufi*, 455 F. App'x 672, 675–76 (6th Cir. 2012) (concluding the district court did not err in its estimation of economic loss through its acceptance of Agent Deters's application of the

comparative stores method). The post-search warrant method has similarly garnered acceptance from courts in this Circuit. *See United States v. Jarjis*, 551 F. App'x 261, 261–62 (6th Cir. 2014) (mem) (implicitly accepting use of post-search warrant method where it yielded a similar loss amount to that derived from two other methodologies); *see also United States v. Bui*, 11-cr-00015, (W.D. Mich. July 20, 2011), ECF No. 97, pp. 20–30 (Pg. ID 585–595) (applying post-search warrant method to both (1) the contested economic loss regarding the food stamp program, after contrasting that calculation with the comparable sales method, and (2) the uncontested economic loss involving the WIC program). Consequently, the Court finds that both methods are generally useful for calculating a reasonable estimate of economic loss for WIC and SNAP benefits.

Yet the evidentiary hearing revealed that the Court cannot endorse in full the Government's economic loss calculations. In other words, the evidence does not demonstrate that the Government's loss calculations are correct by a preponderance of the evidence.

First, the comparable stores method, as applied to the facts here, suffers from notable flaws, some of which defense counsel pinpointed during the testimony. For instance, Agent Deters testified that at least two of the five "comparable" stores sold liquor during the relevant time period. *See* Dkt. Nos. 35-12 to 35-15. But as counsel noted, this comparison is troubling because the Defendants' store has never sold

9

liquor and its principal customer base practices a religion that prohibits alcohol consumption. Another difference is that Modern Save A Lot distributed cultural items, e.g. ethnic cooking spices, and no evidence presented at the evidentiary hearing suggests that these unique goods were available in supposedly comparable stores. Because customers visited the Defendants' store and the comparable stores seeking mostly different products, it is not reasonable to view these stores as one-to-one comparisons. *See, e.g.*, *Sayed*, 2014 WL 7157104, at *2 (rejecting defendant's proposed methodology in part because "it fail[ed] to take into account that not all 93 stores accept food stamp benefits, and not all 93 stores serve the same specialized products as H & J.").

Additionally, defense counsel highlighted that one comparable store did not sell WIC benefits for three of the five years pertinent to Ali Muaalla, and for two of the four years relevant to Sena Muaalla. *See* Dkt. Nos. 35-13, 35-15. The Government, of course, omitted that store's lack of WIC redemptions in its calculations. This difference, however, raises unanswered questions about whether a similar number of WIC recipients in the area knew that each store accepted WIC, or whether the WIC redemptions in these two stores comprised a similar percentage of their total sales.

Turning to the post-search warrant method, the calculations there are not totally reasonable as presented for two reasons. The testimony during the

evidentiary hearing showed that the time periods pre- and post-search warrant are so different in length as to constitute questionable comparisons. Specifically, for both Ali and Sena, the Government compares several years' worth of sales data pre-search warrant to only two months of sales data post-search warrant. Agent Deters testified that the Government only had two months of post-search warrant sales data because it prohibited the Defendants from redeeming WIC and SNAP benefits two months after the search warrant. Yet the Court is still not persuaded that the sales in the two months post-search warrant, without any discounting, reflect the amount of fraudulent sales that took place before the execution of the search warrant.

This issue is compounded by Agent Deters's admission that some customers may have avoided Modern Save A Lot after learning that the store was under investigation. This external factor, then, probably artificially depressed the store's post-search warrant sales numbers. As a result of these two considerations, the Court finds that it must discount the Government's economic loss estimate based on the post-search warrant method.

In light of the above, the Court concludes that it will accept both of the Government's methodologies, but will not wholly adopt the Government's calculation of economic loss. Rather, the Court will reduce the Government's estimate and set the economic loss attributable to each Defendant at a figure greater than $550,000, but less than $1,500,000.

11

## IV. Conclusion

Accordingly, the Court will ACCEPT IN PART and REJECT IN PART the Government's calculation of loss. The Court finds that the Government has proven by a preponderance of the evidence that each Defendant's economic loss falls between $550,000 and $1,500,000. The Court will accordingly add fourteen points to their sentencing guidelines, as to their specific offense characteristics.

IT IS SO ORDERED.

Dated: June 12, 2018
/s/Gershwin A. Drain
GERSHWIN A. DRAIN
United States District Judge

### CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
June 12, 2018, by electronic and/or ordinary mail.
/s/ Tanya Bankston
Deputy Clerk